Filed 2/8/24; certified for publication 3/5/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re F.V., a Person Coming Under the Juvenile Court Law. | B329192 (Los Angeles County Super. Ct. No. 22CCJP04342) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RENE S., Defendant and Appellant. | |

APPEAL from the jurisdictional and dispositional orders of the Superior Court of Los Angeles County, Tamara E. Hall, Judge.  Reversed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Rene S. (father) appeals from the jurisdictional and dispositional orders removing his daughter F.V. from father and mother Fa.V. (mother).

Father and F.V. traveled to the United States from Honduras when F.V. was nine years old. When they were unable to cross the border together, F.V. entered the United States alone. Immigration authorities placed F.V. with E.V., a maternal uncle then living in California (maternal uncle) after obtaining mother's consent to that placement. The juvenile court sustained jurisdictional allegations that maternal uncle then sexually abused F.V. Although the juvenile court found mother and father had no reason to know maternal uncle would sexually abuse F.V., the court asserted jurisdiction based on parents allowing F.V. to enter the United States unaccompanied with no plan in place for her care.

As for disposition, the juvenile court indicated it was inclined to return F.V. to mother in Honduras, which could not happen immediately because, inter alia, F.V. had no passport. The court declined to place F.V. with father, finding his housing situation was "not stable" and F.V. did not want to relocate to Texas, where father now lived. Consequently, F.V. remained in foster care.

We hold there was insufficient evidence of future risk to F.V. to support jurisdiction. At the time of the jurisdiction hearing, F.V. was no longer in maternal uncle's custody, and

there was no indication mother and father would allow maternal uncle access to her.  Assuming arguendo F.V.'s entering the United States alone demonstrated a failure to supervise and protect her, that circumstance was unlikely to recur given father was now in the United States and able to care for her, and mother wanted her back in Honduras.  To the extent mother and father disagree as to who should care for F.V., that is not a basis for the juvenile court's involvement.

Accordingly, we reverse the jurisdictional and dispositional orders.

## BACKGROUND

### 1. *Referral and initial investigation*

On November 1, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging maternal uncle, with whom F.V. resided, had sexually abused F.V.  F.V. was 10 years old at the time.  DCFS removed F.V. and maternal uncle's daughter, M.V., and placed them in foster care.[1]

DCFS's investigation revealed the following.  F.V. had traveled to the United States from Honduras with father approximately 11 months earlier.  F.V.'s family lived in poverty, and "had heard younger children were being allowed into the United States."  Their first attempt to cross the border was unsuccessful.  F.V. then crossed without father and was detained

---

[1] At various times in these proceedings, F.V. and M.V. gave detailed accounts of the sexual abuse they suffered.  Those details are not relevant to our resolution of this appeal, and we do not summarize them.

by immigration authorities.  Mother, still in Honduras, consented to the immigration authorities placing F.V. with maternal uncle.  Father arrived in the United States later and was living in Texas.

F.V. told mother during a videochat that maternal uncle had sexually abused her.  Mother called another relative in California, D.R., and asked her to call the police, which D.R. did, thus leading to the referral.  When a social worker spoke with D.R., D.R. reported that she knew maternal uncle because they were from the same town in Honduras.  She said when she was 14 years old, maternal uncle "would try to touch her body and she would get rocks to defend herself from him."

Maternal uncle had prior child welfare history.  DCFS found "Inconclusive" a March 1, 2022 referral stating maternal uncle hit his daughter, M.V., with a belt on numerous occasions.  DCFS also found inconclusive a December 18, 2021 referral alleging maternal uncle, then living in a shelter with M.V. and an unidentified second child, had left the children unsupervised.  On October 5, 2021, M.V. reported that years earlier, one of maternal uncle's friends had raped her, although she had never told her father.  DCFS found "no allegation reported or concerns of risk."

F.V. told DCFS she wished to return to mother in Honduras.  Mother's preference was for F.V. to live with father and hoped DCFS could help father get custody; otherwise, mother wanted F.V. to return to Honduras.  Mother stated she was "residing in . . . poverty."

Father also stated he would like DCFS's assistance in obtaining custody of F.V.  He said he was having trouble getting money because he had no fixed employment and was undocumented.  He also was "not living in the best place and

4

understands the USA requires for the child to be [in] a safe environment."

## 2.  *Detention*

On November 3, 2022, DCFS filed a Welfare and Institutions Code[2] section 300 petition seeking to detain F.V. The petition asserted identical allegations under section 300, subdivisions (b)(1) and (d).  The allegations stated that mother and father had "placed the child in a detrimental and endangering situation by allowing the child to come to the United States from Honduras unaccompanied resulting in the child residing with the maternal uncle . . . ."  The allegations then set forth in some detail the sexual abuse suffered by F.V.

At the detention hearing, the juvenile court found father to be F.V.'s presumed father.  Father requested a prerelease investigation and return of F.V. to father or placement with father's relatives.  Mother requested the child be released to both parents and to stay with father in the United States.  Minor's counsel stated minor wished to be released to mother or father, but because of the impracticality of doing so at that time, minor's counsel submitted, requesting a prerelease investigation of father, paternal relatives, and mother.

The juvenile court ordered F.V. removed and detained from parents.

## 3.  *Proceedings leading to adjudication and disposition*

In a prerelease investigation report filed less than a month after the detention hearing, mother stated she now believed it

---

[2]  Unspecified statutory citations are to the Welfare and Institutions Code.

5

was in F.V.'s best interests to return to mother in Honduras. Mother stated she was not employed, and lived with her three other children, ages 19, 16, and 12. Father and mother's adult son supported her financially. DCFS conducted a virtual assessment of mother's two-bedroom home via WhatsApp and reported no concerns.

Father stated he would like F.V. to be in his care. He was working in construction and lived by himself in a one-bedroom trailer with a sofa bed in the living room. DCFS conducted a virtual home assessment of the trailer and reported no concerns. Father informed DCFS of the school and medical and dental providers he had located for F.V. should she be placed with him. He also gave DCFS the name of someone he had found to look after F.V. while father was at work.

DCFS found no criminal history for mother or father.

The juvenile court held a pretrial release hearing on December 1, 2022. Father asked F.V. be released to him. Mother asked that DCFS facilitate her fingerprinting, which DCFS had cited as a reason for not releasing F.V. to her. F.V.'s counsel stated F.V. "would like to be released to one of her parents," but submitted on the prerelease investigation because "there are logistical issues to work out in terms of the practicality of getting her, physically, either to Texas or Honduras." F.V.'s counsel asked that at disposition DCFS consider release to parents, and "outline in the report the logistics of return or plans for that."

DCFS objected to releasing F.V. to parents because DCFS would be unable to monitor the case if the child were in Honduras or Texas, father had said someone else would watch F.V. while he was at work, and father's residence "may be temporary because of relocation services being offered through

6

that state." The court denied release to parents, citing the reasons stated by DCFS and F.V.'s counsel.

In the jurisdiction and disposition report, mother stated she did not know maternal uncle was sexually abusing F.V. until F.V. told her. Father stated he first heard of the sexual abuse allegations when a DCFS social worker informed him.

Mother and father both reported that although they had been in a relationship with each other until recently, they no longer were on speaking terms. They did not provide further details.

Mother continued to assert her belief that F.V. would be best off in her care. Father stated he wanted F.V. in his care but believed she would also be safe in mother's care. F.V. stated she did not want to reside with father, and mother had told her "only [mother] will take care of her and keep her safe."

Both parents had telephonic visits with F.V. two to three times a week. At their request, DCFS allowed longer and more frequent visits. F.V.'s caregiver reported parents called at their scheduled times and were always respectful.

A last minute information filed December 30, 2022 stated a Texas social worker had visited father's trailer to conduct a home assessment and reported no concerns. Father reported to the social worker that he earned $400 a week and paid $350 a month in rent.

At a January 5, 2023 hearing, DCFS again opposed release to parents, stating there had been no recent contact with mother, and although father had been assessed and "[e]verything looks fine," F.V. did not want to relocate to Texas. F.V.'s counsel stated F.V. wished to return to mother and counsel was working with immigration authorities to resolve the logistical issues in

returning F.V. to Honduras.  Father contended F.V. should be released to him because he was employed and had proper housing.  The juvenile court again denied release to either parent.

In a last minute information filed January 26, 2023, father reported he was unemployed and could not provide financial support for his children in Honduras.  An attorney provided notarized confirmation that mother had no criminal history in Honduras.

At a February 1, 2023 hearing, F.V.'s counsel requested that DCFS assist in obtaining a passport for F.V. to travel to Honduras and arrange for her to attend immigration hearings.  DCFS did not object to the request and the juvenile court granted it.  Father reasserted he wanted F.V. placed with him.

In a last minute information filed February 24, 2023, father stated he was still residing in the same place and did not intend to relocate.  The last minute information further indicated the DCFS social worker had communicated with DCFS's immigration unit about options for securing F.V. legal status in the United States, and also what would be required to obtain an emergency travel passport from the Honduran consulate.  The immigration unit stated it could contact the consulate about the passport if the juvenile court issued an order to assess mother's home for placement.

### 4.  *Adjudication and disposition*

The adjudication and disposition hearing took place on March 6, 2023.  DCFS argued the juvenile court should sustain the petition in full because parents knew or should have known maternal uncle was a sexual abuser yet placed F.V. in his care.  As evidence of parents' knowledge, DCFS pointed to maternal

8

relative D.R.'s statement that maternal uncle had tried to sexually abuse her when she was 14.

Mother argued she did not know or have reason to know maternal uncle was a sexual abuser, and when she found out, she acted appropriately by calling D.R. and asking her to intervene. Mother argued F.V. no longer was in danger so none of the allegations in the petition should be sustained. Mother wanted F.V. returned to her but acknowledged she needed DCFS's involvement for that to happen.

Father similarly argued he had no reason to know maternal uncle was a sexual abuser. He disputed the assertion that parents had allowed F.V. to come to the U.S. alone, noting he had accompanied her, but they were separated at the border.

F.V.'s counsel asked the juvenile court to sustain the petition under section 300, subdivision (b), but to dismiss the allegation under subdivision (d), which would require parents to have known or reasonably known F.V. was in danger of sexual abuse. F.V.'s counsel argued sending F.V. to live in a foreign country alone at the age of nine placed her in an inherently dangerous situation. F.V.'s counsel contended, however, there was no evidence parents should have anticipated the sexual abuse, and both reacted appropriately when they found out.

The juvenile court dismissed the subdivision (d) count, finding no evidence D.R. told either parent that maternal uncle had tried to sexually abuse her, and therefore no evidence parents knew F.V. would be sexually abused. The court sustained the subdivision (b) count, because maternal uncle did sexually abuse F.V., as alleged, and parents "did place their child in a detrimental environment . . . by sending a nine-year-old to this country by herself to reside with family members."

As for disposition, DCFS asked F.V. not be placed with either parent. DCFS argued it had no "information at this time that mother would be appropriate today if the child were returned to her care. She had reason to send the child to the United States. There's no information that those reasons have abated or have changed." DCFS contended father was living in a shelter in Texas, and there was no evidence F.V. would be adequately supervised if placed with him. Also, DCFS noted F.V. had stated she did not want to relocate to Texas.

Mother requested placement with her with the understanding there were immigration issues preventing F.V.'s return to Mother. Mother argued there was no clear and convincing evidence that F.V. would be at risk if placed with her.

Father requested placement with him, arguing he lived in a trailer, not a shelter, and there was no evidence of risk of harm. He noted that Texas has its own child welfare agency. If the court would not place F.V. with him, father "would be in agreement with returning the minor to mother."

F.V.'s counsel stated F.V. wished to return to Honduras. F.V.'s counsel contended father had been "transient" in Texas, and although he may be settled for the moment, at bottom F.V. did not want to live with him. Because of passport and immigration issues, F.V.'s counsel requested suitable placement with the court revisiting the issue of release to mother later. F.V.'s counsel stated the Honduran consulate would require both parents to participate before F.V. could receive a passport, so counsel requested the court order the parents to cooperate in accomplishing that. F.V.'s counsel further stated F.V. had an immigration hearing scheduled on May 30, "at which time her

attorneys will be asking the court to authorize [F.V.'s] voluntary departure to Honduras."

The juvenile court found, "The best place for this child, so that she can heal mentally, emotionally, psychologically is with her mother." The court cited evidence that F.V. had tried to tell her mother about the abuse but maternal uncle had prevented it, and noted that mother had taken immediate action when she finally learned of the abuse.

The court denied placement with father, finding "[f]ather's housing is not stable for this child. It is not in the child's best interest to be bounced yet to another environment, in another jurisdiction where the father's housing is not stable only for this child to be subjected to more instability."

The court ordered "suitable placement with the understanding that there's a possibility that will change to home-of-parent to mother after the immigration hearing because the child does need a passport to travel back to Honduras." The court ordered parents to facilitate the passport process. The court further ordered both parents to complete parenting and sexual abuse awareness courses and engage in individual counseling.

Father timely appealed from the jurisdictional and dispositional orders.

## DISCUSSION

Father argues the evidence was insufficient for the juvenile court to assert jurisdiction over F.V. We agree.

" 'In reviewing the jurisdictional findings . . . , we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record

11

in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

The juvenile court asserted jurisdiction under section 300, subdivision (b)(1), which permits a court to take jurisdiction if, inter alia, "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶]  (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  [¶]  (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."

The juvenile court expressly found no evidence that mother or father had reason to know maternal uncle would sexually abuse F.V.  Accordingly, maternal uncle's sexually abusive acts could not, by themselves, justify assertion of jurisdiction.  The juvenile court instead asserted jurisdiction based on parents' sending F.V. into the United States alone without a plan for her care.

Father disputes that the circumstances of F.V.'s entry into the United States demonstrated a failure to adequately supervise or protect F.V.  Father argues, "The record does not address how F.V. specifically crossed the border, at what point [father] separated from her, and, prior to her entry, whether the parents made arrangements with [maternal uncle] to provide for F.V.'s care once in the United States."

We need not decide whether parents failed adequately to supervise or protect F.V. at the time she crossed the border. Even if they did fail in this regard, " 'previous acts of neglect,

12

standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citations.]' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394 (*Savannah M.*), italics omitted, abrogated on other grounds by *In re R.T.*, *supra*, 3 Cal.5th at p. 628.)

Here, there was no evidence that the harm F.V. suffered following her entering alone into the United States would recur. At the time of the jurisdiction hearing, F.V. was no longer in maternal uncle's custody. There was no indication mother or father would allow maternal uncle access to F.V.—as the juvenile court found, neither had a reason to know maternal uncle was a sexual abuser, and mother took appropriate action to protect F.V. once she found out. Thus, there was no evidence at the time of the jurisdiction hearing that maternal uncle remained a danger to F.V.

Nor was there reason to think that the circumstances leading to parents' allegedly negligent decision to send F.V. into the United States alone would recur. Father took F.V. to the United States because the family lived in poverty and had heard the United States was allowing younger children to enter. F.V. crossed the border by herself because father could not cross with her, and mother was still in Honduras with their other children.

These circumstances had changed significantly by the time of the jurisdiction hearing. Father was now in the United States himself and could care for F.V. There was nothing in the record to suggest he could not do so—he had a residence, was working in construction, and had found a school, medical and dental care, and a caregiver for F.V. while he was at work. Both DCFS and a Texas social worker had evaluated his home and identified no

problems. Indeed, at the January 5, 2023 hearing DCFS stated, "Everything looks fine," and objected to placement with father only because F.V. stated she did not want to relocate to Texas. The juvenile court's finding at the disposition hearing that father's housing was "unstable" is not supported by the record—there is no indication father was transient or that his housing situation was tenuous. Although father reported in the January 26, 2023 last minute information he was "currently unemployed," we are aware of no authority that a parent's unemployment by itself is a basis to assert dependency jurisdiction.

Mother made clear she no longer had interest in F.V. being in the United States, and wanted her back in Honduras. Any concern that mother might again send F.V. into the United States unaccompanied is not supported by the record.

We acknowledge that mother and father during the jurisdiction hearing did not agree as to which of them should care for F.V., and reported they were no longer on speaking terms. Parental disagreement as to custody, however, is a family law matter, and not a reason for the juvenile court to get involved.

In defense of the jurisdictional order, DCFS argues that during the 11 months F.V. lived with maternal uncle, father did not attempt to take custody of her. Also, when mother first spoke to a social worker, she stated she "d[id] not believe [F.V.] could be with father as he is not doing well financially." Father explained early in the proceedings that at that time, he was having difficulty finding work and housing, which presumably is why he did not come for F.V. As noted, the record indicates that since that time, father has obtained housing and work.

14

DCFS argues that because father needs to arrange a caregiver for F.V. while he works, he is "plac[ing] her in yet another unstable situation where she would be under the supervision of a stranger." Parents are free to arrange for babysitters, and that decision is not, in and of itself, evidence of risk supporting jurisdiction.

DCFS argues *Savannah M.* is distinguishable because in that case, the parents left their children with an inappropriate caregiver for a single night (*Savannah M.*, *supra*, 131 Cal.App.4th at pp. 1390–1391), whereas mother and father sent F.V. into the United States alone, and were far from her for many months, "unable to assist her in any way after [F.V.] disclosed" the sexual abuse.

The significance of *Savannah M.* for our purposes is the proposition that, whatever a parent's past mistakes, jurisdiction is proper only upon a showing of substantial risk of future harm. (See *Savannah M.*, *supra*, 131 Cal.App.4th at p. 1394.) In reversing the jurisdictional order in *Savannah M.*, the Court of Appeal reasoned there was insufficient evidence the parents reasonably should have foreseen that the caregiver, a family friend, would sexually abuse their daughter, and even if the parents were "somewhat negligent," they had taken appropriate action once they learned of the sexual abuse. (*Id.* at pp. 1396–1397.) Under those circumstances, the notion that they might in the future allow a sexual abuser "to manipulate them into caring for their daughters" was "mere speculation." (*Id.* at p. 1397.)

In the instant case, similarly, the juvenile court found mother and father had no reason to know maternal uncle was a sexual abuser, and mother took appropriate and immediate action when she found out. There is nothing in the record to

15

suggest mother and father would make that mistake again. Further, discussed above, there was no evidence that the circumstances that led to F.V. being alone in the United States are likely to recur, now that father is in the United States and mother wants F.V. back in Honduras.

Our reversal of the jurisdictional order also necessitates reversal of the dispositional order. (*In re Roger S.* (2018) 31 Cal.App.5th 572, 583.)

## DISPOSITION

The jurisdictional and dispositional orders are reversed.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.

16

Filed 3/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re F.V., a Person Coming Under the Juvenile Court Law. | B329192 (Los Angeles County Super. Ct. No. 22CCJP04342) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RENE S., Defendant and Appellant. | CERTIFICATION AND ORDER FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

The opinion in the above-entitled matter filed February 8, 2024, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

CERTIFIED FOR PUBLICATION.

_____

ROTHSCHILD, P. J.          BENDIX, J.          WEINGART, J.